**In the Matter of FIRST GEORGIA FINANCIAL CORPORATION, d/b/a Idle Hour Hardware, Debtor.**

**In the Matter of Arthur GRIFFITH III, Individually and d/b/a Eneas Farms, Debtor.**

**Mary C. GRIFFITH, Plaintiff,**

**v.**

**Arthur GRIFFITH III and First Georgia Financial Corporation, Defendants.**

**Bankruptcy Nos. 90–51375, 90–51374. Adv. No. 90–5072.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Oct. 23, 1990.

David L. Mincey, Macon, Ga., for Mary C. Griffith.

James C. Marshall, Macon, Ga., for First Georgia Financial Corp., d/b/a Idle Hour Hardware.

Richard M. Katz, Macon, Ga., for Arthur Griffith III, Individually and d/b/a Eneas Farms.

## STATEMENT OF THE CASE

ROBERT F. HERSHNER, Jr., Chief Judge.

Mary C. Griffith, Plaintiff, filed a "Complaint for Damages for Conversion of

Funds; for Equitable Relief Against Both Defendants; and Under Title 11 USC § 523(c), for a Decree as to Arthur Griffith III that the Obligations are Non–Dischargeable" on June 5, 1990. Arthur Griffith III, Debtor, Defendant, and First Georgia Financial Corporation, Debtor, Defendant, filed timely answers. A trial was held on September 20, 1990. The Court now publishes its opinion.

## FINDINGS OF FACT

Arthur Griffith III[1] is the son of. Plaintiff. Plaintiff and her husband jointly owned, with right of survivorship, a portfolio of stocks and bonds. Plaintiff's husband died in July 1987, and she became the sole owner of the securities. The securities were worth about $291,000 in August 1987. The securities declined in value by about $35,000 during the "stock market crash" of October 1987. Plaintiff asked Debtor and her stock broker for investment advice. The stock broker advised her not to sell the securities. Debtor advised her to sell the securities, which she did on December 4, 1987. The proceeds were put into a money market account that paid about five-and-one-half percent interest.

About three weeks after Plaintiff sold the securities, Debtor told her that he was planning to open a mortgage banking business. Debtor told her that this business would be "just like the old Griffith Mortgage Company." Griffith Mortgage was a mortgage banking business founded by Debtor's grandfather in 1951. Debtor's father worked there for a number of years. Debtor also worked there from 1964 until the business was sold in 1973. Debtor was in charge of mortgage operations for a local real estate company from 1983 until January 1988. He earned about $130,000 in both 1986 and 1987. Simply stated, Plaintiff knew that Debtor had substantial experience and success in the mortgage banking business.

Plaintiff wanted to earn more interest on her money than the money market account

---

**1.** Arthur Griffith III will be referred to as "Debtor." The other defendant will be referred to as

First Georgia Financial.

paid. Plaintiff gave Debtor a check for $260,000 dated January 13, 1988. This check was written by Debtor and signed by Plaintiff. In the lower left-hand corner, Debtor wrote that the check was "For Transfer." Plaintiff contends Debtor told her that he would invest her money in first mortgages in her name. Debtor contends that he told Plaintiff that he would put her money into the business he was going to open and pay her eight percent interest. He contends that he did not tell Plaintiff that he would buy mortgages in her name.

Debtor opened his new business, First Georgia Financial, on February 10, 1988. Debtor used $250,000 of Plaintiff's money to purchase, in his name, 2500 shares of stock in the corporation. Debtor was the sole shareholder of the corporation. Debtor used the other $10,000 of Plaintiff's money for personal living expenses. Debtor put $39,500 of his own money into the corporation. The corporation also received a line of credit for $250,000 from Liberty Savings Bank.

Plaintiff gave Debtor a second check for $25,000 dated September 7, 1988. This check also was written by Debtor and signed by Plaintiff. The check shows that it was "For Mtges."

Debtor made the following direct deposits into Plaintiff's bank account:

| Date of Deposit[2] | Amount |
|---|---|
| 2/16/88 | $ 1,841.66 |
| 4/19/88 | 1,841.67 |
| 4/19/88 | 1,841.67 |
| 5/19/88 | 1,841.67 |
| 7/06/88 | 1,841.67 |
| 9/07/88 | 1,841.67 |
| 9/07/88 | 1,841.67 |
| 10/7/88 | 1,841.67 |
| 12/23/88 | 600.00 |
| 1/12/89 | 1,900.00 |
| 3/02/89 | 1,900.00 |
| 8/04/89 | 800.00 |
| | $19,933.35 |

Debtor contends that the deposits of $1841.66 and $1900 represent the eight percent interest he promised to pay Plaintiff. Plaintiff telephoned Debtor several times concerning the irregular deposits. Debtor told her that his secretary had forgotten to

make the deposit and that he would take care of it. It is undisputed that Plaintiff never asked to see her mortgages or asked how they were doing. Plaintiff testified that she trusted her son.

Unfortunately, First Georgia Financial was not successful and closed around the end of May 1989. Debtor sold the building and fixtures on June 30, 1989. He used part of the proceeds to buy an existing business, Idle Hour Hardware. The hardware store is owned by First Georgia Financial. The name of the hardware store has been changed to Idle Hour Hardware and Horse Supply.

Debtor filed a petition under Chapter 11 of the Bankruptcy Code on May 21, 1990. Debtor schedules, as unsecured, a debt owed to Plaintiff in an amount in excess of $285,000. First Georgia Financial Corporation also filed a petition under Chapter 11 of the Bankruptcy Code on May 21, 1990. First Georgia Financial schedules, as unsecured, disputed, contingent and unliquidated, a debt owed to Plaintiff in the amount of $285,000.

There is only one significant issue. Plaintiff contends that her money was to be put into first mortgages in her name. This would have resulted in security with a good return. If this had been done, she would not have been affected by the bankruptcy of Debtor or of First Georgia Financial. Debtor contends that Plaintiff's money was a loan to him to start his new business, First Georgia Financial. Debtor contends he prepared and signed two promissory notes in favor of Plaintiff at her dining room table when she gave him the two checks. These promissory notes were not produced at trial.

Plaintiff's 1988 federal income tax return shows that she received $16,705 in interest income from Debtor. The tax return shows the "payer" to be Debtor. The Court notes that if the money had been placed in first mortgages in Plaintiff's name, the mortgagor rather than Debtor would have been the payer.

---

2. Debtor may have made a direct deposit of $1,372 on September 8, 1988.

Debtor's 1988 federal income tax return shows that he paid $22,430 in interest to Plaintiff.[3] Debtor published a "Personal Financial Statement" to Trust Company Bank of Middle Georgia, N.A., dated March 30, 1989. He listed an unsecured debt of $285,000. This is the exact amount of Plaintiff's two checks.

Three of Plaintiff's daughters testified concerning their conversations with Plaintiff and Debtor. These witnesses are Debtor's sisters. Louise Griffith lives at Plaintiff's home. Louise Griffith testified that she thought Plaintiff's money had been put into mortgages and that Plaintiff was the mortgagee. In February 1989, she confronted Debtor and "wanted to see on paper all the first mortgages to see where they were." Debtor told her that "it was too complicated for her to understand." After Debtor closed First Georgia Financial, she talked to Debtor's wife, the corporation's secretary. Debtor's wife told Louise Griffith that Plaintiff's mortgages were safe. Debtor never told his sister that he would put Plaintiff's money in first mortgages and never discussed with her what he had done with the money.

Derrelle Griffith Ballard testified that the first time she talked with Debtor about Plaintiff's money was in August 1989. Mrs. Ballard had reviewed Plaintiff's bank statements and noticed that Debtor had not made a direct deposit for an interest payment in several months. Debtor told Mrs. Ballard that Plaintiff had loaned him the money and that he had invested it in mortgage inventories. Plaintiff was present during this conversation and objected when Debtor used the term "loan." Debtor told Mrs. Ballard that he had a promissory note in favor of Plaintiff in his safe-deposit box. Debtor showed her a copy of the promissory note the next day.

Carol Griffith Hahn testified by telephone deposition. She testified that at some time before Christmas 1988, Plaintiff told her that Plaintiff had given Debtor some money to be put into first mortgages

in her name. The first time Mrs. Hahn talked with Debtor about the money was in June 1989. She had reviewed Plaintiff's bank statements and noticed that Plaintiff was not receiving any income from the mortgages. Debtor told her the money was in mortgage inventories that would start paying again in about two or three months. Debtor told Mrs. Hahn that he was going to sell his farm, horses, and other holdings to repay Plaintiff.

The Court, having considered the testimony of the witnesses and the other evidence presented, is persuaded that Plaintiff has not carried her burden of showing that Debtor agreed to put her money into first mortgages in her name. Plaintiff's check for $260,000 shows that it was "For Transfer." Debtor made deposits for interest on this amount into Plaintiff's bank account. Plaintiff's and Debtor's federal income tax returns show that Debtor paid interest income to Plaintiff. Plaintiff's check for $25,000 was written about eight months after the $260,000 check. Plaintiff received fairly regular interest payments from Debtor during these months. Debtor's "Personal Financial Statement" lists an unsecured debt in the amount of Plaintiff's two checks. Plaintiff contends that "For Mtges" means "for mortgages in her name." The evidence, however, is consistent with a loan transaction.

## CONCLUSIONS OF LAW

■ Plaintiff contends that Debtor and First Georgia Financial wrongfully converted her money to their own use. Plaintiff contends that Debtor holds title to $250,000 of the capital stock of First Georgia Financial in constructive trust for her. Plaintiff contends that First Georgia Financial holds title to Idle Hour Hardware and Horse Supply in constructive trust because the hardware store was purchased with Plaintiff's money without her consent or subsequent ratification.

---

**3.** At trial, Debtor stated that this amount is incorrect and that he may need to correct his tax return.

Plaintiff relies upon *Hancock v. Hancock*,[4] in which the Supreme Court of Georgia stated:

> Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it.

205 Ga. at 694, 54 S.E.2d at 392 (quoting *Murray County v. Pickering*, 196 Ga. 208, 26 S.E.2d 287 (1943)).

The court continued, saying:

> (a) Where a grantee holds property impressed with a constructive trust in favor of the grantor, and conveys such property to another, who has notice and knowledge of the circumstances creating the constructive trust, the latter takes the property subject to the equities of the original grantor, and is a proper party in a suit seeking to impress the property with a constructive trust.

205 Ga. at 695, 54 S.E.2d at 392.

The Court is persuaded that the money used to purchase Debtor's stock in First Georgia Financial was not acquired by fraud. Debtor told Plaintiff that he would put her money into the business he was going to open and pay her eight percent interest. This is what Debtor did until November 1988, when he was no longer able to make the monthly interest payments. Thus, Plaintiff has failed to prove her equitable trust theory.

Plaintiff also contends that the debt of Debtor is nondischargeable under section 523(a)(4) of the Bankruptcy Code.[5] Plaintiff contends that her money was obtained by defalcation while Debtor was acting in a fiduciary capacity and by larceny.

In *Schweig v. Hunter (In re Hunter)*,[6] the United States Court of Appeals for the Eleventh Circuit stated:

Because of the very nature and philosophy of the Bankruptcy law the exceptions to dischargeability are to be construed strictly, and the burden is on the creditor to prove the exception.

. . . .

The burden is on the creditor to prove the debtor's culpability by clear and convincing evidence.

780 F.2d at 1579.

Complaints on dischargeability are strictly construed against creditors because exceptions to dischargeability frustrate the fresh start and rehabilitative process of the Bankruptcy Code. *Georgetown Village Apartments v. Fontana (In re Fontana)*, 92 B.R. 559, 561 (Bankr.M.D.Ga.1988).

The Court notes the following language from Judge Ginsberg's publication on bankruptcy:

> The more difficult questions are presented by debts resulting from fraud or defalcation by a fiduciary. The two major issues that arise are (1) whether the debtor was acting in a fiduciary capacity when the debt was created, and (2) what constitutes "defalcation."
>
> To be a fiduciary for dischargeability purposes, the debtor must be a trustee under an express or "technical" trust, or a trust created by statute. An express or technical trust is formed by the positive acts of both parties manifested by a writing, such as a deed, will or other agreement. The easy case is when the debtor is an express fiduciary at the time the debt is created, such as when the debtor is the executor of an estate, a corporate officer or director, or an attorney.
>
> Whether a debtor is a fiduciary for nondischargeability purposes is a question of federal bankruptcy law rather than of state law, although state law is

---

4. 205 Ga. 684, 54 S.E.2d 385 (1949).

5. 11 U.S.C.A. § 523(a)(4) (West 1979 & Supp. 1990). This section provides:
   (a) A discharge under section 727, 1141[,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

   . . . .
   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
   11 U.S.C.A. § 523(a)(4) (West 1979 & Supp. 1990).

6. 780 F.2d 1577 (11th Cir.1986).

relevant to the inquiry. Because an express or technical trust is required, a debtor's obligation that arises under a constructive trust will not make the debtor a fiduciary for the purposes of this provision.

The trust must arise before the act creating the debt occurs; that is, the trust must not result from the act creating the debt.

. . . .

Defalcation requires a lesser showing of intent than fraud. In fact, no element of intent may be required. Negligent misappropriation of funds is probably sufficient. It is probably enough to show that the debt resulted from a breach of fiduciary's duty of care. So, if a fiduciary is unable to account for funds, or commingled funds, the debt is nondischargeable. It is not required that an affirmative misappropriation of those funds be shown. Nor is it necessary to show that the debtor benefitted from the funds. Subjective intent to violate a fiduciary duty is irrelevant to a determination of defalcation under [§ 523(A)(4)].

1 *R. Ginsberg, Bankruptcy* ¶ 11.06[g] (2d ed. 1989).

The Court notes the following language from *Collier on Bankruptcy:*

Larceny is the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to his (the taker's) use without the consent of the owner. As distinguished from embezzlement, the original taking of the property was unlawful.

3 *Collier on Bankruptcy,* ¶ 523.14[3] (15th ed. 1990).

The Court has previously determined that Debtor did not agree to put Plaintiff's checks into first mortgages in her name. The transaction between Plaintiff and Debtor was in the form of a loan to help Debtor open a new business. Unfortunately, this business failed. The Court is persuaded that Plaintiff has not carried her burden of showing that this debt is nondischargeable. Plaintiff's request for an award of attorney fees must be denied.

An order in accordance with this memorandum opinion will be entered this date.

## ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that the relief sought in the "Complaint for Damages for Conversion of Funds; for Equitable Relief Against Both Defendants; and Under Title 11 USC § 523(c), for a Decree as to Arthur Griffith III that the Obligations are Non–Dischargeable" filed on the 5th day of June, 1990, by Mary C. Griffith, Plaintiff, is hereby denied.

SO ORDERED.